Edwin Hale Abbot & others *vs.* Waltham Watch
Company & others.

Suffolk.    January 24, 1927. — May 23, 1927.

Present: Rugg, C.J., Braley, Crosby, Pierce, & Wait, JJ.

*Corporation*, Reorganization, Officers and agents, Sale of assets. *Equity Pleading and Practice*, Master: findings of fact, exceptions to report. *Fraud*.

Upon detailed findings of fact by a master to whom was referred a suit in equity by minority stockholders of a Massachusetts corporation to set aside, by reason of alleged fraud of directors, members of stockholders' committees and a banking concern which underwrote the transaction, an executed reorganization of the corporation and the formation of a new corporation to which its assets were transferred, it appeared that the defendants acted in good faith and without fraud or breach of trust, and that a reorganization was necessary, and it was *held,* that

(1) The appointment of stockholders' protective committees, the members of which were unofficially nominated to the stockholders by the directors, was not fraudulent either as to the corporation or to its stockholders; it was a legitimate and usual proceeding taken to safeguard their interests;

(2) The facts, that, through the reorganization, there was a sale of the assets of the old corporation to the new corporation; that the underwriters were to receive $7,000,000 in securities for payment of $5,300,000 and their underwriting; that preferred stockholders, if they subscribed for a new prior preference stock in the new corporation, were to get eighty per cent of the par value of their old stock in the new corporation without additional payment therefor and only twenty-five per cent if they did not so subscribe; that holders of common stock were to get in common stock of no par value less than one third as much of that stock in the new corporation if they did not subscribe for the new prior preference stock as they would if they did so subscribe; and that enough cash was procured for the payment of all the debts of the old corporation, did not constitute a fraud in law upon the corporation or upon its minority stockholders;

(3) In this stockholders' suit an individual stockholder was not entitled to relief for an alleged wrong to him personally; a fraud to be effectual for the maintenance of the suit must be a fraud upon the corporation; only the rights of the corporation were litigated;

(4) The judgment of the directors, the members of the protective committees, and the other defendants acting honestly and in good faith could not be questioned by minority stockholders;

(5) There was nothing in G. L. c. 156, § 42, which prescribed what the consideration for the sale should be or how it should be paid: those were matters for the corporation in the exercise of its powers to determine;

(6) In the circumstances, the consideration for the sale of the assets of the old company consisted of a promise to pay its debts and the issuance of stock in the new company instead of a payment in cash: there was nothing illegal in that method of payment;

(7) Nothing was paid into the corporate treasury for distribution among the stockholders;

(8) There was no discrimination between the two classes of stock of the old corporation;

(9) As between those who did and those who did not subscribe to stock in the new corporation, there was no injustice, for the additional shares issued to those who subscribed were issued for an independent consideration; they were in no sense a bonus;

(10) No plaintiff voted against the action taken for reorganization at the stockholders' meeting and therefore none was entitled to have an appraisal under G. L. c. 156, § 46;

(11) It did not appear that any attempt had been made to deprive any stockholder of the old company of the shares to which he was entitled in the new company provided he deposited his stock within a reasonable time;

(12) While there was no doubt that the defendants worked together to bring about a reorganization of the old company, there was nothing to show that they did not act in good faith and with a desire to accomplish what they believed to be for the best interests of the old company and its stockholders; allegations in the bill that the defendants combined to procure a sale of the assets of the old company to the new company upon terms unjust and inequitable were not proved, and the master found to the contrary;

(13) The circumstances, that the underwriting bankers assisted the chairman of the board of directors of the old corporation, after he felt himself committed to the plan of reorganization, to secure a loan so that he could obtain his stock and use it in voting for reorganization, did not affect the validity of the plan nor show any corrupt or fraudulent conduct on his part toward the old company.

While the directors of a corporation occupy a fiduciary relation toward the corporation and cannot lawfully divert the proceeds of its capital or other assets, but must exercise their authority with the utmost good faith, they are not responsible for mere errors of judgment in the conduct of the corporate business.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on August 13, 1923, and afterwards amended, by several holders of common and of preferred stock of Waltham Watch Company (denominated by the master the "old company") against that corporation, the Waltham Watch and Clock Company (denominated by

the master the "new company"), certain officers and directors, members of the common and the preferred stockholders' committees, Frederic C. Dumaine, the members of the firm of Kidder, Peabody and Company, and Old Colony Trust Company, averring "that the defendants with knowledge that the improved financial and manufacturing condition of the old company rendered it unnecessary, combined and schemed to dissolve the old company and to sell its assets to the new company on February 8, 1923, on terms which were unjust and inequitable to the old company and its stockholders and which they knew so to be, and that to carry out the object of the combination the defendants intentionally withheld from the stockholders information which it was their duty to give, and gave partial, misleading, and false information"; and seeking discovery; general relief; that the sale be declared void; that receivers be appointed to bring any actions and to receive any assets and damages recovered; that the assets and business be returned to the old company or to its receivers; that the damages sustained by the old company be ascertained and· execution issue therefor; and that the first bond mortgage of the new company to the Old Colony Trust Company be declared void.

The suit was referred to a master.  Material facts found by the master are stated in the opinion.

By order of *Braley,* J., the suit was reserved for determination by the full court.

*J. W. Allen & E. H. Abbot, Jr.,* (*H. W. Packer* with them,) for the plaintiffs.

*C. F. Choate, Jr.,* (*R. Wait* with him,) for Waltham Watch Company and others, defendants.

*J. Noble,* for Gifford K. Simonds and others, defendants.

*S. H. Pillsbury,* (*N. Leonard* with him,) for Old Colony Trust Company, defendant.

CROSBY, J.   This is a bill in equity by which the plaintiffs, minority stockholders, for themselves and other stockholders of the Waltham Watch Company, a Massachusetts corporation, seek to set aside the reorganization of the company.   The grounds for relief alleged are that the several defendants conspired to procure the dissolution of the com-

pany and the sale of all its assets to the defendant Waltham Watch and Clock Company, upon terms unjust and inequitable to the old company and its stockholders, and that the same was accomplished by the use of unlawful means and with knowledge that the condition of the old company did not require such sale and dissolution. The case was referred to a master in accordance with the usual rule "to hear the parties and their evidence, to find the facts, and report the same to the court." The evidence is not reported. *Hutchinson* v. *Nay*, 183 Mass. 355, 359. *Daniels* v. *Daniels*, 240 Mass. 380. The master states that the report "contains, except as the court otherwise determines as matter of law from what has been stated, whatever combination, scheme, knowledge, intention, injustice, inequity, . . . falsity, fraud, . . . there was on the part of the defendants or plaintiffs." The case was reserved by a single justice of this court upon the pleadings, the master's report, and the plaintiffs' objections thereto.

The Waltham Watch Company was organized in 1906, and acquired a business that had been carried on for many years principally in the manufacture of watches under names in which the words "Waltham Watch" had been a part. Since the organization the company has manufactured watches, clocks, speedometers and other products. At the end of the World War the company found itself in an unsatisfactory financial condition. In the spring of 1921, one Brown, the treasurer, became the general manager, and engaged C. E. Knoeppel and Company, Inc., efficiency engineers, for advice respecting the methods of manufacture and management. This company was retained until the spring of 1922. On September 19, 1921, the directors employed Day and Zimmermann, a reliable engineering firm, to make an appraisal; they found that the merchandise on hand was over $11,000,000 — more than one half the gross assets and nearly equal to the par value of the capital stock — and reported this to be excessive. The balance sheet sent to the stockholders on March 31, 1921, showed the merchandise account to be $11,329,549.83, which represented nearly one half of the total assets. Trade names and such were carried

at over $2,700,000. The liabilities, accounts payable and notes were over $5,500,000, and coupon notes due in 1924, were $3,000,000. The notes payable were held largely by banks. The balance sheet in September, 1921, showed a loss of about $192,000, and F. S. Moseley and Company, bankers, who for some years had sold the notes of the company to banks, reported that they could not then do so satisfactorily.

In October, 1921, the company owed banks $2,950,000 on notes which would mature from time to time up to October 1, 1922. It desired an extension which the banks agreed to until October 1, 1922, the notes to bear interest at seven per cent during that period. An additional credit of $1,-580,000 at seven per cent and two per cent commission was allowed to meet obligations, including the $3,540,000 owed by the company to its banks of deposit, which was secured by a pledge of the company's receivables. As a part of this agreement, it was provided that one Simonds, representing the banks, should undertake the management of the company. He was accordingly elected a director in November, 1921, and subsequently he was elected president. He reduced the stock on hand by sale, reduced the labor force, and brought about other economies on his own judgment and upon recommendations of C. E. Knoeppel and Company, Inc. On May 22, 1922, the treasurer's report containing a balance sheet was sent to the stockholders; it showed a net loss for the year of $170,000. The master found that this balance sheet accurately summarized the books, and that in the report there was nothing misleading about the balance sheet unless it appears in the explanations made in connection with it, or the course of the selling business.

During the period of nearly a year and a half preceding the termination of this extension agreement the directors had endeavored to sell bonds or notes of the company, or to bring about a reorganization with a view to placing the company on a sound financial basis. Their efforts included applications to many private bankers, and attempts toward a consolidation with the Elgin Watch Company and the Hamilton Watch Company, but they were without success. At the expiration of the extension agreement, the banks refused to

extend further the time for payment of the notes held by them. Accordingly a circular dated October 16, 1922, was sent by the directors to the stockholders, which contained the balance sheet of August 31, 1922, showing a loss, plus the deficit of $1,291,448.08, and a statement that a reorganization was necessary and that stockholders' committees were to be formed.

The plaintiffs contend that this circular was false and misleading, but the master found that "The narrative in this circular . . . is correct. There is no reference in it to the manufacturing reorganization which had been mentioned in the circular of May 22, 1922. The results of that reorganization had not appeared to the directors so pronounced that any one of them was conscious of omitting an important piece of information to the stockholders. None of the directors were much impressed at this time with the prospect of great savings in manufacturing through the work of C. E. Knoeppel and Company, Inc. . . . . They all believed that Simonds had done well . . . . The directors were not conscious of keeping back from the stockholders information which they ought to have." As the directors realized that the company could not continue unless its obligations, including its bank loans, were taken care of, the stockholders' protective committees were formed, all the members of which were interested in the stock or had some connection with the old company. He further found that the circular was not misleading: it "was calculated to lead the stockholders into the belief that a reorganization of the old company was required" and "any committees appointed would seek to safeguard the interests of the old company and of its stockholders"; that it "was not calculated to lead the stockholders to believe that the committees were to be appointed by the directors . . . [but] to believe that the directors approved the committees appointed," as they did.

Two deposit agreements of the same import, under date of October 18, 1922, were executed by the two committees with the American Trust Company as depositary. These agreements provided that the shareholders might become parties by depositing their stock. Notices were sent to

the stockholders urging them to do so and stating the condition of the company.   These notices were intended to induce stockholders to deposit their stock promptly with the respective committees.   The bill alleges that the intention was to induce this by falsely and fraudulently pretending that the condition of the company was so serious that reorganization was necessary, that the interests of the preferred stockholders would be safeguarded, and that by depositing their stock the best solution of the difficulty would be accomplished.   The master found that there was no falsity, pretence or fraud "unless what has already been stated above amounts to such as matter of law."

Ezra C. Fitch, chairman of the directors and the holder of considerable stock, on November 13, 1922, wrote personal letters to some of the holders of large amounts urging them to deposit their stock.   The plaintiffs claim that the statement in this letter, "I have deposited my stock and that of the various members of my family, amounting to a large number of shares," was false.   It appeared that the statement was true unless it included the stock of his son, Conover Fitch.   The latter had deposited about half of his stock at this time.   He did not live with his father but maintained a household of his own.   Ezra C. Fitch intended to include his son who he assumed had or would deposit his stock.

In October 1922, one Stockton, of the Old Colony Trust Company which was a large creditor of the Waltham Watch Company, saw the defendant Winsor, a partner in the firm of Kidder, Peabody and Company, and suggested that that company undertake the financial reorganization of the watch company.   Later Loring, one of the directors, sent to Winsor papers and documents relating to the company, and Winsor with others made an inspection of the plant and found that it had been badly managed.   Winsor thereafter proposed two plans for reorganization, both of which were rejected.

By this time the condition of the company had slightly improved, but a sufficient interval had not elapsed to show how great the improvement was, or whether it was likely to be permanent.   During the extension period there had been a net loss of about $143,000, and on December 31, 1922, the

total deficit was about $1,300,000. About the middle of December Winsor submitted a third plan which was substantially like the one that was finally accepted, and which was printed under date of December 28, 1922. Although the committees were not entirely satisfied with it, they believed it was the best available and that if the company were not properly financed the banks would force payment of their loans. It provided for the organization of a new company to take over the assets and to pay the debts of the old company. "Under this plan, Kidder, Peabody and Company or their syndicate were to get $3,000,000 par of mortgage bonds, $3,000,000 par of debentures, and $1,000,000 par of 6 per cent preferred stock,— a total par of $7,000,000, — for $5,300,000. The stockholders in the old company, if they elected to subscribe, were to get $1,700,000 par of the 7 per cent cumulative prior preference stock. Kidder, Peabody and Company were to underwrite, and to get such of this as was not taken by stockholders in the old company. The stockholders holding the $5,000,000 of preferred stock of the old company were, if they subscribed for the prior preference stock, to get $4,000,000 par of the preferred stock in the new company without additional payment. This, with the $1,000,000 of this stock which Kidder, Peabody and Company were to have, made up the $5,000,000 of the new issue. Preferred stockholders in the old company who did not subscribe for the new stock were to get, instead of 80 per cent, only 25 per cent par of the new preferred stock. The remaining 55 per cent was to go to Kidder, Peabody and Company. The holders of common stock in the old company, for their $7,000,000 par of common stock, were to get, if they subscribed for the new prior preference stock, 63,000 no-par shares of Class B common stock. If they did not subscribe, they were to get 17,500 of these shares. The balance of the 70,000 Class B common stock was to go to Kidder, Peabody and Company. The Kidder, Peabody and Company syndicate was to purchase all the 25,000 Class A common shares for cash at $10 a share."

This plan would provide the new company with $7,250,000 in cash with which to liquidate the $7,200,000 indebtedness

of the old company.   Kidder, Peabody and Company also were to provide a management, and one F. C. Dumaine, who was reputed to have executive ability, was to serve without salary.   The directors voted to approve the plan on January 2, 1923, and a circular was sent to the stockholders recommending its acceptance.   Both protective committees also sent notices recommending its adoption, and asked that proxies be sent to the American Trust Company.   On the same date the directors mailed to the stockholders notice of a stockholders' meeting to be held on February 8, 1923, to determine whether the plan should be approved and to act upon other matters in connection therewith.

The master states that "The plaintiff attacks the words in the circular of January 2, 'If this plan fails of adoption there seems to be no alternative except a forced liquidation which will in all probability wipe out any equity of the Stockholders.'"   In this connection the master states: "There was no alternative in sight.   There was the possibility that another refinancing plan might come to light. There was none in sight, unless it be what is hereafter stated. If there was a forced liquidation, there was, as such things go, no probability of anything being left for the stockholders."   The matter above referred to by the master related to the application of A. C. Allyn and Company of Chicago to finance a reorganization of the old company.   In December, 1922, this company's representative saw Simonds, the manager of the old company, and proposed that he should head a plan.   The latter took the matter under advisement and conferred with Burr who was a member of the common stockholders' committee.   Burr investigated the financial standing of A. C. Allyn and Company and decided that it was not sufficiently strong for such an undertaking.   The directors were also consulted and they suggested the submission of a plan by A. C. Allyn and Company.   No plan was submitted at that time, but afterwards one was prepared and sent direct to the stockholders; before it was sent, however, Simonds withdrew his support on the ground that the plan did not promise to be successful and that it might prevent carrying out the Kidder, Peabody and Company plan.

Later A. C. Allyn and Company opened negotiations with the defendant Hildreth, who for several years and up to February 8, 1923, was a director of the old company, and prepared another plan; but it never was submitted to the directors or to the committees, although Hildreth assured A. C. Allyn and Company that it would be considered if submitted.

The master states that "Whether or not A. C. Allyn and Company could have floated a bond issue of the required size for the old company, it is impossible to say. The Massachusetts market was the natural one for these securities in view of the locality in which the old company was best known. A. C. Allyn and Company were not as widely known in that market as are Boston bankers. An underwriting by Kidder, Peabody and Company assured the money. A. C. Allyn and Company, by their printed plan, did not propose to underwrite, but to organize a syndicate which would. No one could know whether they would succeed in getting the underwriting. They had succeeded in other instances. It does not appear whether or not they had failed in any."

When the stockholders met on February 8, 1923, more than two thirds of each class of stock had been deposited. In general the stockholders had received the reports and circulars sent them. Mr. Loring, a director and formerly managing director, was unanimously chosen chairman, and there were present, in person, stockholders holding 81 shares of common and 559 shares of preferred stock, and, by proxy, stockholders holding 59,747 shares of common and 43,596 shares of preferred stock. This was out of a total stock outstanding of 70,000 shares of common and 50,000 shares of preferred. The chairman read the offer embodied in the Kidder, Peabody and Company plan and it was accepted. The plaintiff Abbot did not deposit his stock and did not vote. The new company, the Waltham Watch and Clock Company, was organized the next day. The properties of the old company were transferred to it in accordance with the terms of the plan proposed by one Hanson of the American Trust Company, who acted for the new company until it was incorporated. At about this time a mortgage was

executed to the Old Colony Trust Company to secure the first mortgage bonds; and shortly thereafter the various bonds, debentures, and stocks were issued in accordance with the terms of the plan. The master states that it was contended by the plaintiffs that on February 8, 1923, the assets of the old company which passed to the new company were in excess of its debts assumed by the new company to the extent of more than $10,750,000. He found that they were not worth that amount; that they had no market value; and that, if sold as a whole at a forced sale, or in parts not in a going business, they would not have brought enough to pay the debts. He further found that the preferred stock was not worth par and that the common stock had little value.

The master has found in detail the condition of the old company for a considerable time before the plan for reorganization was considered, and the efforts to place it on a sound financial basis without resorting to reorganization. His conclusion is that "Nothing but a financial reorganization or refinancing, or forbearance by the current creditors, could prevent a receivership or bankruptcy." His findings, unless mutually inconsistent or plainly wrong, must stand. *Ginn* v. *Almy*, 212 Mass. 486. *Fay* v. *Corbett*, 233 Mass. 403. *Glover* v. *Waltham Laundry Co*. 235 Mass. 330. *Flaherty* v. *Goldinger*, 249 Mass. 564, 567.

The appointment of the stockholders' protective committees was not fraudulent either as to the corporation or to its stockholders. It was a legitimate and usual proceeding taken to safeguard their interests. It amounted to the formation of a voting trust and was not contrary to the policy of our law. *Brightman* v. *Bates*, 175 Mass. 105, 111. *Greene* v. *Nash*, 85 Maine, 148. It was not fraudulent in law for the directors unofficially to nominate the committees. *North-West Transportation Co. Ltd.* v. *Beatty*, L. R. 12 A. C. 589.

It was not a fraud in law upon the corporation or its minority stockholders to adopt the plan for reorganization. The corporation could sell all its assets. G. L. c. 156, § 42, provides that "Every corporation may, at a meeting duly

called for the purpose, by vote of two thirds of each class of stock outstanding and entitled to vote . . . authorize the sale . . . of all its property and assets, including its good will, upon such terms and conditions as it deems expedient." There is nothing to show fraud or deception in any of the steps taken before the meeting held on February 8, 1923. On the other hand, it expressly appears that notice of the meeting and all other requirements of the statute were strictly observed. The vote of acceptance was by much more than two thirds of the stock. The master found as a fact that there was no fraud practised by any of the defendants in procuring the adoption of the plan, and we are unable to find that the acts of the defendants or any of them were fraudulent in law.

If the minority stockholders believed that no reorganization was necessary, or that more favorable terms might have been secured, they do not show that the plan adopted was unjust, inequitable or fraudulent. The findings show that many attempts had been made by the directors to find some way of avoiding reorganization, and to procure more favorable terms to the corporation and the stockholders than the Kidder, Peabody and Company plan offered, but without success. The company's large indebtedness had to be taken care of without further extension, and it seemed probable, if not certain, that there must be a liquidation or a reorganization. The master found that a liquidation would result in nothing being left for the stockholders of either class; that if the assets "had been sold to purchasers for reorganization or to go on with the business without interruption, the price which could be obtained would be a matter of trading and not ascertainable." It appears that A. C. Allyn and Company were the only brokers found who were willing to undertake the reorganization. If the plan submitted by them can be considered as an offer, it is doubtful if it was as favorable as the one made by Kidder, Peabody and Company; besides, it was uncertain if it could have been carried out. The plaintiffs have failed to show and it does not appear that any one would offer a higher price for the assets than was received.

In this stockholders' suit only the rights of the corporation are litigated. The fraud alleged must be a fraud on the corporation. An individual stockholder is not entitled to relief for an alleged wrong to him personally. *Converse* v. *United Shoe Machinery Co.* 185 Mass. 422. *Perry* v. *Hayes,* 215 Mass. 296. *Willett* v. *Herrick,* 242 Mass. 471, 482.

The finding of the master that there was no fraud, concealment or false representations on the part of the directors or of the other defendants is conclusive. No fraud in their conduct is shown as matter of law. The case shows that the defendants acted honestly and in entire good faith in their endeavor to carry out the will of the majority of the stockholders. The judgment of the directors, the members of the protective committees and the other defendants acting honestly and in good faith cannot be questioned by minority stockholders. *Treadwell* v. *Salisbury Manuf. Co.* 7 Gray, 393, 404. *Hannigan* v. *Old Colony Trust Co.* 227 Mass. 370, 374. *Willson* v. *Waltham Watch Co.* 293 Fed. Rep. 811. *Koehler* v. *St. Mary's Brewing Co.* 228 Penn. St. 648. *Flynn* v. *Brooklyn City Railroad,* 158 N. Y. 493, 507.

The consideration for the sale of the assets of the old company consisted of a promise to pay its debts and the issuance of stock in the new company instead of a payment in cash. There was nothing illegal in that method of payment. *Treadwell* v. *Salisbury Manuf. Co., supra.* There is nothing in the statute (G. L. c. 156, § 42) which prescribes what the consideration for the sale shall be or how it shall be paid. Those are matters for the corporation in the exercise of its powers to determine.

The master found that the plan provided a method for payment of the debts, impossible under a forced sale of the assets. The plan was not a fraud in law, nothing was paid into the corporate treasury for distribution among the stockholders. Such payment would have been a fraud upon the creditors. There was no discrimination between the two classes of stock. The disposition of the securities of the new company under the plan was not a fraud upon the old company or its stockholders. The decisions in *Page* v. *Whittenton Manuf. Co.* 211 Mass. 424, *Eagleson* v. *Pacific Timber Co.*

270 Fed. Rep. 1008, *Petry* v. *Harwood Electric Co.* 280 Penn. St. 142, and other cases cited by the plaintiffs in this connection, are not applicable to the facts in the case at bar. The allegations of fraud on the part of the directors set forth in the bill in *Bonner* v. *Chapin National Bank of Springfield,* 251 Mass. 401, which were held not to be demurrable, distinguish it from the present case.

There was no discrimination between stockholders. All might surrender their stock and receive twenty-five per cent of its amount in either the new preferred or new Class B common stock, as the case might be. There was equality if all the stockholders chose to subscribe to the new prior preferred stock. As between those who did and did not subscribe there was no injustice, for the additional shares issued to those who subscribed were issued for an independent consideration. They were in no sense a bonus. The reorganization contemplated the putting of a large amount of new capital in the business and the new stock represented different interests from the old capital. In addition, the stockholders in the old company had no interest in the new capital unless and until they had subscribed or surrendered their stock under the reorganization. No assessment was imposed as a condition of receiving a share of the assets of the old company and no such condition under G. L. c. 156, § 46, could lawfully be made. The payment for the new prior preference stock was for a new consideration and not for a share in assets to which the stockholders were entitled.

G. L. c. 156, § 46, gives a dissentient stockholder the right to have an appraisal and payment made for his stock in accordance with the provisions of the statute. *Teele* v. *Rockport Granite Co.* 224 Mass. 20. The master found that Mary Bell Willson was the only plaintiff who voted against the sale of the assets of the old company. She is no longer a plaintiff. The plaintiff Abbot, by letter dated March 5, 1923, addressed to the old company, demanded payment for his stock; but as he did not vote, he did not bring himself within the provisions of the statute.

As no plaintiff voted against the action taken for reorganization, none are entitled to have an appraisal. It is therefore

immaterial to them what provision the plan made for payment of the amounts ascertained by appraisal. The chairman of the meeting at which the plan was adopted stated: "If you do not vote either way, or if you vote in the affirmative, you will receive your share in the securities of the new company." The answer of the new company states "All stockholders of the Waltham Watch Company who have presented their certificates of stock of the Waltham Watch Company for exchange for stock of this defendant have received their proper amount of this defendant's stock whether or not they voted in favor of the sale and reorganization." Answers of several other defendants contain similar statements. It does not appear that any attempt has been made to deprive any stockholder of the old company of the shares to which he is entitled in the new company provided he deposits his stock within a reasonable time. The time within which a stockholder must so deposit in order to obtain the new stock is not stated in the plan.

The allegation in the eleventh paragraph of the bill that the defendants combined to procure a sale of the assets of the old company to the new company upon terms unjust and inequitable has not been proved as a fact; the master's findings are to the contrary. It is impossible to hold, in view of the entire findings, that any conduct of the defendants was fraudulent in law. There is no doubt the defendants worked together to bring about a reorganization of the old company, but there is nothing to show that they did not act in good faith and with a desire to accomplish what they believed to be for the best interests of the old company and its stockholders. See *Bartlett* v. *New York, New Haven & Hartford Railroad*, 221 Mass. 530, 537.

The circumstance that Kidder, Peabody and Company assisted Ezra C. Fitch to secure a loan so he could obtain his stock and use it in voting for reorganization does not affect the validity of the plan or show any corrupt or fraudulent conduct of Fitch toward the old company. The master found that Fitch felt himself committed to the plan, and to any plan which a majority of the board of directors would accept, before the arrangement for the loan to him was made.

It is settled that the directors of a corporation occupy a fiduciary relation toward the corporation. They cannot unlawfully divert the proceeds of its capital or other assets, and they must exercise their authority with the utmost good faith. But they are not responsible for mere errors of judgment in the conduct of its business. *Lyman* v. *Bonney,* 118 Mass. 222. *Elliott* v. *Baker,* 194 Mass. 518, 523. *Bartlett* v. *New York, New Haven & Hartford Railroad, supra. Guay* v. *Holland System Hull Co.* 244 Mass. 240, 246, 247. *Putnam* v. *Handy,* 247 Mass. 406, 409. *Codman* v. *Dumaine,* 249 Mass. 451.

It is manifest from the voluminous record that for a long time before the Waltham Watch Company was reorganized its business was in a serious financial condition and that unless it was refinanced or reorganized it would have to be liquidated; that the directors after endeavoring to obtain a further extension of its loans and financial assistance in other directions, without success, finally decided that the interests of the company and its stockholders would be promoted by the reorganization of the company, and for that purpose adopted the plan offered by Kidder, Peabody and Company as the most favorable they could obtain. The master's findings show that the directors and the committees acted in good faith, with an honest desire to do what was best for the interests of all concerned; that there was no conspiracy, fraud or breach of trust on their part or on the part of the other defendants. His elaborate report and findings of fact fail to show as matter of law any improper conduct on the part of the defendants. It follows that the allegations of the bill have not been proved.

During the hearings before the master, the plaintiffs excepted to seven rulings respecting the admission or limitation of evidence offered by them. An examination of the record shows that in each instance the ruling was plainly right.

The plaintiffs filed thirty-four objections to the report. A majority of them are based upon the contention that certain findings made were erroneous on the ground that they were contrary to or were not supported by the evidence. These findings cannot be reversed in the absence of the

evidence.   *Cook* v. *Scheffreen*, 215 Mass. 444, 447.   *Cosmopolitan Trust Co.* v. *Cirace*, 248 Mass. 98, 103.   We have carefully examined the remaining objections.   They need not be considered in detail.   It is sufficient to say that upon the subsidiary findings the ultimate findings were not wrong, nor were they erroneous as matter of law.   It follows that the objections to the report must be overruled.

A final decree is to be entered dismissing the bill with one bill of costs.

*Ordered accordingly.*